[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 11, 2009
THOMAS K. KAHN
CLERK

_____

No. 06-12583

_____

D. C. Docket No. 00-00213-CR-2-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

versus

ALBERT JORDAN,
JIMMY WOODWARD,

Defendants-Appellants
Cross-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(September 11, 2009)

Before TJOFLAT, HILL and ANDERSON, Circuit Judges.

PER CURIAM:

In the Alabama 1998 general election, Jimmy Woodward, the incumbent Sheriff of Jefferson County, a Republican, was defeated in his bid for reelection by his Democratic opponent by 37 votes. Woodward suspected that numerous felons not eligible to vote had cast absentee ballots in Jefferson County precincts located in the City of Bessemer and decided to contest the election. He hired Albert Jordan, a lawyer, to handle his case.

What transpired after Jordan took the case led to Jordan and Woodward's indictment by a Northern District of Alabama grand jury. The grand jury charged them with using the Sheriff's Office's employees to access the National Crime Information Center database—which houses the criminal records generated by federal, state, and local law enforcement agencies—and obtain the criminal records of those who voted absentee in the Sheriff's race in Bessemer, in violation of 18 U.S.C. § 641.[1] On January 11, 2006, a jury found the defendants guilty of

---

[1] 18 U.S.C. § 641, **Public money, property or records**, states, in pertinent part:
Whoever . . . knowingly converts to his use or the use of another . . . any record . . . or thing of value of the United States or of any department or agency thereof . . .; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been . . . converted--

Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the

2

conspiring to violate, and of violating, that statute, and the district court sentenced each of them to probation for a term of six months and a fine of $500.[2] They now appeal their convictions.[3] The Government cross-appeals their sentences. We affirm.

## I.

## A.

In its case in chief, the Government undertook to establish the following. The Alabama Criminal Justice Information Center ("ACJIC") houses the Alabama Criminal Justice Information System ("ACJIS"), a database that includes all criminal records for the state of Alabama. ACJIC provides information in its database to the National Crime Information Center ("NCIC").[4] On April 10,

counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

[2] The sentences were imposed pursuant to the Sentencing Reform Act of 1984, Pub.L. No. 98-473, 98 Stat. 1987 (codified as amended in scattered sections of Titles 18-28 U.S.C.), and the Guidelines promulgated thereunder by the United States Sentencing Commission.

[3] This case has been before us twice before. In United States v. Jordan, 316 F.3d 1215 (11th Cir. 2003) (Jordan I), we vacated the district court's dismissal of the indictment during the Government's case in chief and remanded the case for trial. In United States v. Jordan, 429 F.3d 1032 (11th Cir. 2005) (Jordan II), we affirmed the district court's denial of Woodward and Jordan's motion to dismiss the indictment on double jeopardy grounds.

[4] The Federal Bureau of Investigation maintains the NCIC.

1996, Jimmy Woodward, as Jefferson County Sheriff, signed an agreement with the ACJIC that allowed his Sheriff's Department access to the ACJIS and NCIC criminal record databases exclusively for law enforcement purposes.[5]  The database  access was limited in this way because the public has a strong privacy interest in these databases.  See Jordan I, 316 F.3d at 1223 n.4; United States v. Pedersen, 3 F.3d 1468, 1471 (11th Cir. 1993).

Alabama's 1998 general election was held on November 3.  Woodward stood for reelection as Sheriff and lost, by only 37 votes.[6]  The polls had not closed before he began receiving complaints of voting irregularities in the City of Bessemer.  A Republican Party poll-watcher at the Bessemer courthouse reported that absentee ballots cast in Bessemer had not been counted; a member of the Bessemer Voters' League claimed that some absentee ballots had been stolen; and

---

[5]  The agreement stated that

the [Jefferson County Sheriff] shall inform all current and future officers and employees under his . . . management [and] control, that all information obtained through ACJIS is for the conduct of official criminal justice business and for this purpose only and that the criminal penalties apply for misuse of said information.

The agreement also stated that such information would be "obtained, used, and further disseminated in strict compliance with all applicable laws, regulations, policies, and procedures . . . [including] NCIC . . . regulations and operating procedures."

[6] Approximately 212,000 votes were cast in the election for Sheriff.

a Sheriff's Department employee received phone calls to the effect that felons, out-of-state residents, and deceased persons voted in Bessemer.

On November 4, Woodward retained Albert Jordan, an attorney specializing in election contest cases. Jordan first attempted to obtain the absentee voter list from the office of the Clerk of the Jefferson County Circuit Court in Bessemer.[7] Jordan was unable to obtain the absentee list, so, on the morning of November 5, he called Royce Fields, the Assistant Sheriff in charge of the Sheriff's Bessemer office, for assistance. After informing Fields that he had been retained by Woodward to challenge the outcome of the November 3 election, he asked Fields to get the absentee voter list from the Clerk's office. Fields acquired the list and phoned Jordan. Jordan asked him to run the "criminal histories" of the voters named on the list to determine whether any were felons.

Over the next four days, with Woodward's approval and under Fields's supervision, three Sheriff's Office employees[8] ran the names of 829 persons on the

---

[7] Birmingham is the county seat for Jefferson County. Bessemer is a "Division" of Jefferson County, having been created as a separate governmental division by the Alabama Legislature in 1915, and is known as the "Bessemer Cutoff." In recognition of this, the Circuit Court of Jefferson County has two Clerk's offices, one at the courthouse in Birmingham and one at the courthouse in Bessemer; the Jefferson County Sheriff's Department has offices in Birmingham and Bessemer; and the District Attorney has offices in both cities. An Assistant Sheriff appointed by the Sheriff heads the Sheriff's office in Bessemer, and a Deputy District Attorney heads the District Attorney's office in Bessemer.

[8] The employees were Fields's secretary in Bessemer and two clerks in Birmingham.

absentee voter list through the NCIC and ACJIS.[9]  They gave Fields the NCIC

printout for each voter having a criminal record.  On November 9, Fields took the

printouts to Woodward.  Woodward, in turn, instructed him to take the records to

Jordan.  Fields did as instructed.  Fields showed Jordan the printouts and stated that

he was worried about leaving them with Jordan because he was required to keep

records provided by the NCIC in his possession.  Jordan replied that Fields could

leave the printouts with him.

On November 19, the morning edition of the Birmingham Post Herald

contained an article stating that Woodward had improperly used criminal databases

to check the criminal history backgrounds of absentee voters in the November 3

election.[10]  Later in the day, Woodward met with Jordan, Fields, and some of his

staff in Birmingham to discuss the Post Herald article.  Woodward expressed

---

[9]  These employees proceeded as follows:  First, they obtained the date of birth or Social Security number for each person on the absentee voter list.  Then, they inserted the voter's name with date of birth or Social Security number into the NCIC and ACJIS.  If neither revealed a criminal history for the voter, they shredded the printout for that person in accordance with ACJIS regulations but made a notation on the NCIC search log indicating that the voter's criminal history had been searched.

[10] Specifically, the Birmingham Post Herald published the following:

The Alabama Criminal Justice Information Center is looking into whether Sheriff Jim Woodward improperly used criminal databases to check the backgrounds of people who applied for absentee ballots.  The center acted after Bessemer Cutoff District Attorney William Russell forwarded a complaint from a Sheriff's Department employee.  Woodward said he did nothing wrong, and has the responsibility as sheriff to investigate voter fraud.

concern that he and Fields might be indicted for using the NCIC database to run criminal record checks on absentee voters. A member of his staff suggested that a criminal charge might be avoided if they had a complaint of voter fraud that might justify the use of the NCIC.

To explore that possibility, Woodward asked the Deputy District Attorney of Jefferson County, Roger Brown, to join the discussion. After Brown arrived, Woodward briefed him about the evidence he had received of voter fraud in Bessemer and asked him whether the evidence was sufficient to make out a criminal charge. Brown stated that any allegations of voter fraud should be handled by the Deputy District Attorney in Bessemer. He also recommended that Woodward contact the Alabama Bureau of Investigation to avoid an appearance of impropriety, given that Woodward had a personal interest in the outcome of the election for Sheriff.

After the meeting adjourned, Woodward formed a "voter fraud task force" and placed Captain Charles Horton in charge. The task force reviewed several complaints of voter fraud and interviewed approximately eighty persons who had voted absentee in Bessemer. The evidence obtained was apparently insufficient to warrant criminal prosecution, as none was instituted.

B.

7

On June 21, 2000, a Northern District of Alabama grand jury returned an indictment charging Woodward and Jordan, in Count One, with conspiring, in violation of 18 U.S.C. § 371,[11] to violate 18 U.S.C. § 641 by receiving, retaining, and converting NCIC records to their own use. Count Two charged Woodward with conveying the NCIC records to Jordan, and Count Three charged Jordan with receiving them, both acts in violation of § 641.[12] The defendants entered pleas of not guilty and promptly moved the district court to dismiss the indictment for failure to satisfy the requirements of Rule 7(c)(1) of the Federal Rules of Criminal Procedure because, in accordance with the language of the rule, they claimed that the indictment failed to provide a definite written statement of the essential facts

---

[11] Section 371 states:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years , or both.

> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

[12] The indictment contained two other counts, alleging that Jordan, in Count Four, and Woodward, in Count Five, violated 18 U.S.C. § 1030(a)(2) and (c)(2). The jury acquitted the defendants of these offenses. Nothing relating to Counts Four and Five offenses is relevant in the parties' appeals.

constituting the offense(s) charged.[13] The district court denied their motions on the ground that the indictment provided the defendants fair notice of the charges lodged against them. Then, on January 3, 2006, following two appeals to this court,[14] the case went to trial. Eight days later, the jury found the defendants guilty as charged of the above counts. Post-verdict, the defendants, presenting the arguments they asserted in their motions to dismiss the indictment, moved the court to arrest the judgment pursuant to Rule 34 of the Federal Rule of Criminal Procedure. The court denied their motions. At sentencing on April 26, 2006, the district court treated the § 641 violations as Class A misdemeanors instead of felonies, because the value of the NCIC records obtained did not exceed the sum of $1,000,[15] and sentenced the defendants to concurrent terms of six months' probation and fined each of them $500.

In their appeals, Woodward and Jordan seek the reversal of their convictions on the grounds that the court erred in denying their motions to dismiss the

---

[13] Rule 7(c)(1) states, in pertinent part: "The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."

[14] See supra note 3.

[15] See 18 U.S.C. § 3559(a)(6). The indictment did not specify that the value of the NCIC records exceeded $1,000. Though the Government introduced evidence from which the jury could have found that the total value of the records obtained exceeded the sum of $1,000, the district court, in its charge to the jury did not instruct the jury specifically to find the total value involved. The Government has conceded that the convictions were for misdemeanor offenses.

indictment and to arrest the judgment. Alternatively, they seek a new trial, asserting error in the court's charge to the jury. The Government cross-appeals, contending that the sentences the court imposed are unreasonable. We turn first to the main appeals, then to the cross-appeal.

II.

A.

The appellants argue that the district court erred in denying their motions to dismiss the indictment and to arrest the judgment. Boiled down to its essentials, their argument is that the indictment failed to provide them with the notice necessary to enable them to defend against the offenses charged.

The legal sufficiency of an indictment is a legal question that we review <u>de novo</u>. <u>United States v. Pendergraft</u>, 297 F.3d 1198, 1204 (11th Cir. 2002). An indictment is considered legally sufficient if it: "(1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." <u>United States v. Woodruff</u>, 296 F.3d 1041, 1046 (11th Cir. 2002). In determining whether an indictment is sufficient, we read it as a whole and give it a "common sense construction." <u>United States v. Markham</u>, 537 F.2d 187, 192 (5th

Cir.1976);[16] United States v. Gold, 743 F.2d 800, 813 (11th Cir.1984). In other words, the indictment's "validity is to be determined by practical, not technical, considerations." Gold, 743 F.2d at 813.

We find that the indictment gave the defendants adequate notice of the charges against them. In its introduction, Jordan is identified as an attorney in the private practice of law. He was "not a law enforcement officer, nor was he authorized to access the NCIC and ACJIS systems." (Indictment, ¶ 8.) Rather, "the information in the systems could be obtained and used by [law enforcement] agencies only for limited official purposes." (Id. at 1, ¶ 3.)

Count one, alleging a conspiracy to violate 18 U.S.C. § 641, tracked the language of § 641 and asserted that the defendants required employees of the Sheriff's office to access the NCIC and ACJIS databases, obtain printouts of the criminal records of absentee voters, and then deliver the printouts, which as property of the United States had a value in excess of $1,000, to Jordan for use in Woodward's election contest. (Id. at 4-5, ¶¶ 1-7.) The overt acts committed in furtherance of the conspiracy included the November 5, 1998 telephone conversation between Fields and Jordan, the completion of the NCIC searches, the

---

[16] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

11

delivery of the information they disclosed to Jordan, and the meeting with District Attorney Brown, all as described in part I.A., supra. (Id. at 5-6, ¶ 8.) In Counts Two and Three, respectively, the indictment alleged that Woodward conveyed to Jordan and Jordan received from Woodward a "thing of value of the United States, that is, information contained in the NCIC records." (Id. at 7.)

"An indictment that tracks the language of the relevant statute is sufficient, as long as it also provides a statement of facts and circumstances that give notice of the offense to the accused." Russell v. United States, 369 U.S. 749, 765, 82 S. Ct. 1038, 1048, 8 L. Ed. 2d 240 (1962) (cited in United States v. Walker, 490 F.3d 1282, 1296 (11th Cir. 2007)). The indictment in this case met this standard. It gave the defendants fair notice of the essential elements of the charged offenses, that is, notice sufficient to enable them to prepare a defense.[17]

_____

[17] Appellants contend that the indictment failed to allege a § 641 offense, or a conspiracy to commit the offense, because, according to the indictment's allegations, Jordan was acting as Woodward's attorney and, as such, was entitled to receive the NCIC records. Put another way, they argue that Jordan was entitled to the possession of the NCIC printouts in order to prosecute Woodward's election contest. We are not persuaded. First, § 641 is violated when, as here, the NCIC is used for non-law enforcement purposes. Second, Jordan did not receive the printouts from Woodward as part of a confidential communication between an attorney and his client. When Fields delivered the printouts to Jordan, and he was not Jordan's client; nor was he acting as Woodward's agent for the purpose of delivering a confidential communication from Woodward to Jordan. Third, assuming that the printouts were part of a confidential communication between a client and his attorney, the delivery of the printouts to Jordan constituted a crime, and the crime-fraud exception removed the delivery of the printouts from the protection of the attorney-client relationship.

12

B.

Appellants argue that the evidence was insufficient to support their respective convictions. In determining whether the prosecution established a defendant's guilt, we consider the evidence, all inferences that reasonably can be drawn therefrom, and credibility choices in the light most favorable to the prosecution. United States v. De La Mata, 266 F.3d 1275, 1301 (11th Cir. 2001).

To prove conspiracy under 18 U.S.C. § 371, the prosecution must prove beyond a reasonable doubt

> the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it. However, if the proof shows the defendant knew the essential objective of the conspiracy, it does not matter that he did not know all its details or played a minor role in the overall scheme.

United States v. Suba, 132 F.3d 662, 672 (11th Cir. 1998) (citations omitted). Thus, in the case at hand, the evidence had to show that Woodward and Jordan entered into an agreement to access the NCIC database and obtain for a non-law enforcement purpose a thing of value to the United States, to-wit: the criminal record of anyone who voted absentee in the 1998 election for Sheriff of Jefferson County. As for Counts Two and Three, the evidence had to show that Woodward knowingly and without authority conveyed a thing of value, a criminal record

obtained from the NCIC, to  Jordan, and that Jordan knowingly received and retained it.

Taking the evidence in the light most favorable to the United States, the evidence established that Woodward retained Jordan as his personal attorney to challenge the election results; Jordan asked Woodward's employee, Fields, to conduct a criminal record search for absentee voters; Woodward was aware that Fields and his personnel were conducting the search; Woodward asked Fields to provide the results to Jordan; Fields gave the NCIC printouts to Jordan and explained that they had been generated by the NCIC; Jordan asked Fields to leave the NCIC printouts with him, though Fields told him that he should not part with the documents; and Jordan subsequently used some of the information the printouts disclosed to prosecute Woodward's election contest.  Further, the day the Birmingham Herald Post reported on Woodward's use of the criminal databases, Woodward held a meeting, which Jordan attended, to announce that a Sheriff's Department task force was launching a voter fraud investigation.  A reasonable factfinder could infer from this that Woodward convened the task force to cover up his and Jordan's use of the NCIC to prepare for an election contest.  See Suba, 132 F.3d at 672.

14

In arguing that the evidence was insufficient to convict, appellants advance a different view of the evidence. Our task, however, is limited to determining whether a reasonable jury could have found the defendants guilty on the basis of the evidence presented; our task is not to choose between competing interpretations of the evidence. The evidence does not need to "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001). "Presented with two narratives, one tending to establish the defendant's guilt and another tending to establish innocence, the jury was entitled to choose the account offered by the government." United States v. Allison, 908 F.2d 1531, 1535 (11th Cir. 1990) (citations omitted). Here, we are satisfied that the jury's verdicts have ample support in the evidence.

## C.

Given that we do not reverse their convictions on the grounds that the indictment failed to state an offense or the evidence was insufficient to convict, appellants alternatively seek a new trial on the theory that the district court erred in

refusing to instruct the jury in accordance with instructions Jordan requested.[18]

We review the district court's refusal to give a requested jury instruction for abuse of discretion. United States v. Martinelli, 454 F.3d 1300, 1309 (11th Cir. 2006). Such refusal constitutes reversible error if: "(1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself." Id. We find no abuse of discretion here.

Two of the requested instructions, numbers 26 and 27, related to Jordan's good faith defense. Jury Instruction No. 26 was framed as follows:

> Good faith of the Defendant Albert Jordan is a complete defense to the charges in the indictment against Defendant Albert Jordan since good faith on the part of the Defendant is inconsistent with criminal intent which is an essential part of those charges. The burden of proof is not on the Defendant to prove good faith, of course, since the Defendant has no burden to prove anything. The Government must establish beyond a reasonable doubt that the Defendant acted with criminal intent as charged in the indictment. One who acts based upon an honestly held opinion, or an honestly formed belief, is not chargeable with criminal intent even though the opinion is erroneous or the belief is mistaken; and, similarly, evidence which establishes only that a person made a mistake in judgment does not establish criminal intent.

Jury Instruction No. 27 stated:

---

[18] Although the record is not clear on the point, we assume that Woodward joined in Jordan's requests for whatever benefit the proposed instructions may have afforded him.

> It is a complete defense to the offenses charged in the indictment that the Defendant Albert Jordan had a good-faith belief that his actions were not in violation of the law. It is not necessary for you to be convinced that a reasonable person would have believed the Defendant's actions were lawful. Unless you are convinced beyond a reasonable doubt from the evidence in this case that the Defendant Albert Jordan believed his actions to be unlawful, then you must find him not guilty.

Instead, the district court charged the jury that, to convict on the conspiracy count, the evidence must show that "the defendant, knowing the unlawful purpose of the plan, willfully joined in it." Further, the defendant had to engage in the unlawful conduct charged in the substantive counts "knowing[ly]" and "willfully." The court defined "knowingly" and "willfully" thusly:

> The word knowingly as that term has been used in the indictment and in these instructions means that the act was done voluntarily and intentionally and not because of mistake or accident.

> The word willfully as that term has been used means that the act was committed voluntarily and purposely with the specific intent to do something that the law forbids, that is, with criminal purpose, either to disobey or to disregard the law.

The court did not abuse its discretion in declining to give Jordan's instruction numbers 26 and 27 because their concepts were substantially included in the instruction that the criminal act must be done "knowingly" or "willfully." See Martinelli, 454 F.3d 1300, 1316 (11th Cir. 2006) (finding no abuse of discretion where definition of "knowingly" in jury instruction substantially covered

17

good faith concepts); <u>United States States v. Giraldi</u>, 86 F.3d 1368, 1376 (5th Cir. 1996) (same).

Appellants find error in the court's refusal to give their proposed instructions numbered 57, 60, and 61, which related to the duty of an attorney to review documents provided by his client under the cloak of the privileged attorney-client relationship. Number 57 is illustrative of the three requested instructions. It states:

> [A] lawyer may review documents, things, information, etc. provided by a client as part of the attorney/client relationship. The mere receipt of such items or information from a client is lawful. It would only be unlawful if the attorney had knowledge that the client intended to use the information in a future criminal act.

This was both a confused and an incorrect statement of the law because it conflated the crime-fraud exception to the attorney-client privilege with the duty of an attorney to act competently when preparing a case[19] and thereby appeared to render the crime-fraud exception a nullity. Moreover, Jordan's obligation to provide Woodward competent service would not immunize Jordan from prosecution for violating 18 U.S.C. § 641. To hold otherwise would imply that an attorney may lawfully receive the fruits of an unlawful act under the guise of the attorney-client relationship.

---

[19] <u>See</u> Ala. R. of Prof'l Responsibility 1.1 ("A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.")

III.

The Government cross-appeals appellants' concurrent sentences of six months' probation, contending that the sentences are unreasonable.[20] We review the reasonableness of a sentence under "a deferential abuse of discretion standard." Gall v. United States, 552 U.S. 38, __, 128 S. Ct. 586, 591, 169 L. Ed. 2d 445 (2007). "This standard of review is altogether consonant with our traditional use of the abuse of discretion standard." United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1096 (11th Cir. 2004). "The abuse of discretion standard of review recognizes that for the matter in question [, i.e., in sentencing] there is a range of choice for the district court and so long as its decision does not amount to a clear error of judgment we will not reverse even if we would have gone the other way had the choice been ours to make." McMahan v. Toto, 256 F.3d 1120, 1128 (11th Cir. 2001); United States v. Pugh, 515 F.3d at 1191.

---

[20] The Government does not challenge the $500 fine imposed in connection with the sentences.

19

In the Guidelines sentencing context, the district court applies an incorrect legal standard in fashioning a sentence, and therefore abuses its discretion, if it fails to determine the Guidelines sentence range correctly, treats the Guidelines as mandatory rather than advisory, fails to afford the parties their procedural rights,[21] or fails to consider the sentencing factors set out in 18 U.S.C. § 3553(a). Gall, 552 U.S. at __, 128 S. Ct. at 597.[22]

In its cross-appeal, the Government concedes, and properly so, that the district court correctly determined the Guidelines sentence range for each defendant, which called for a term of imprisonment of 27 to 33 months.[23] Since the value of the property obtained from the NCIC did not exceed $1,000, however, the violations of 18 U.S.C. § 641 (Counts Two and Three) were treated as Class A misdemeanors. The maximum penalty provided by statute for those misdemeanor

---

[21] See, e.g., Fed. R. Crim. P. 32. Among the rights Rule 32 affords the parties at sentencing is the right to introduce evidence relating to an objection to the presentence report or an objection made during the sentencing hearing, to provide counsel for the parties an opportunity to address the court, and to "permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(2), (4)(A)(i), (iii).

[22] Gall's list of legal requirements the district court must satisfy in arriving at a sentence is not exhaustive. We mention the requirements pertinent to our review in this case.

[23] In arriving at the sentence range, the district court grouped the two counts of which the defendants were convicted pursuant to U.S.S.G. § 3D1.2(d), and fixed the total offense level at 18 pursuant to U.S.S.G. § 2C1.1, and the criminal history category of I pursuant to the sentencing table at U.S.S.G., Chapter 5, Part A., because the defendants' criminal history points amounted to zero. An offense level 18 at category I yielded a sentence range of 27 to 33 months' imprisonment.

20

offenses was imprisonment for one year. 18 U.S.C. § 641. Since the statutory

maximum penalty was less than the Guidelines sentence range, the statutory

maximum penalty became the Guidelines sentence range.[24]

The seven § 3553(a) sentencing factors the district court was required to, and

did, consult before imposing sentence were as follows:

> The first factor is a broad command to consider 'the nature and
> circumstances of the offense and the history and characteristics of the
> defendant.' 18 U.S.C. § 3553(a)(1). The second factor requires the
> consideration of the general purposes of sentencing, including:
>
> the need for the sentence imposed-
>
> (A) to reflect the seriousness of the offense, to promote respect for the
> law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most
> effective manner. § 3553(a)(2).
>
> The third factor pertains to 'the kinds of sentences available,' §
> 3553(a)(3); the fourth to the Sentencing Guidelines; the fifth to any
> relevant policy statement issued by the Sentencing Commission; the
> sixth to 'the need to avoid unwarranted sentence disparities,' §

---

[24] U.S.S.G. § 5G1.1(a) provides that "[w]here the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence." The Government does not contend that the court should have considered imposing consecutive one-year sentences (on the two counts for which the defendants were convicted), so as to create a "guideline sentence" of 24 months.

3553(a)(6); and the seventh to "the need to provide restitution to any victim,' § 3553(a)(7). Preceding this list is a general directive to 'impose a sentence sufficient, but not greater than necessary, to comply with the purposes' of sentencing described in the second factor. § 3553(a).

Gall, 552 U.S. at __, n. 6, 128 S. Ct. at 597, n.6

After taking these factors into account—in particular, the need for the sentences to satisfy the objectives of §3553(a)(2)(A) through (D)—the district court concluded that imprisonment was not needed "to protect the public from further crimes of the defendant," objective §3553(a)(2)(C), and focused on whether imprisonment was necessary to satisfy the objectives of §3553(a)(2)(A) and (B).[25] Regarding §3553(a)(2)(A), the need for punishment to reflect the seriousness of the offenses, the court observed that "the nature of the offense is somewhat troubling in that it is at one level a serious offense . . . [but] at another level, in the grand scheme of things, is not so serious." The judge based this observation on:

> 1) the duration and extent of the offense (this was an isolated crime of relatively short duration); 2) the level of sophistication or complexity of the offense (the offense involved very little planning or concealment and could have easily been discovered); 3) the fact this was not a violent crime; and 4) the fact there is no reported loss to the alleged victim(s) of this crime.

---

[25] Although the district court did not explicitly address the need for rehabilitation, § 3553(a)(2)(D), in the probation context, the court indicated that rehabilitation was not an objective of the sentences it was imposing, citing Jordan's excellent reputation as one who attempted to combat voter fraud and Woodward's "flawless" record of law enforcement service.

22

The court also found that the defendants' conduct did not violate any voter's privacy because the information obtained was publically available, i.e., apart from the NCIC database, and not used for blackmail.

The district court then considered whether a sentence of probation would satisfy the deterrence purpose of §3553(a)(2)(B), stating:

> So to afford adequate deterrence for criminal conduct, I don't think there's any suggestion here that the public suffering of these two defendants or damage to their reputation, the five and a half or six years that this has been pending, such is not a deterrence in and of itself to anyone who might consider similar conduct.

In its post-judgment sentencing report, which memorialized what the court had stated on the record at the sentencing hearing, the court wrote: "The conviction, in and of itself, and this sentence with the attendant public humiliation, the monetary cost of a six-year defense, and the loss of earning power in the future . . . will deter similar criminal conduct."

After the court heard from counsel for the parties and afforded the defendants their right of allocution, it sentenced them to probation for a term of six months. The prosecutor thereafter read the following objection into the record:

> I would submit, Judge, that there has been abuse of the public trust in this case given what defendant Woodward's position was, and given that defendant Jordan is a member of the Court. I think these are unfortunate circumstances for the defendants, their family, and their friends, however, the defendants have not expressed any legitimate or compelling reasons why the Guidelines calculation of 18 which imposes a jail sentence should not be imposed. I would direct the Court

23

too to the fact that punishment, Your Honor, should not just mean punishment but it also should serve as a deterrent factor for the community. In this particular case, we are talking about corruption. We are talking about two individuals who happened to be in a position that other people don't have the opportunity to be in. Being elected to a public office is an honor. Being—having the ability and the opportunity to go to law school to become a member of the Bar is something that most members of our community don't enjoy and don't have the opportunity.

In its brief on cross-appeal, the Government argues that the sentences of probation are unreasonable because the district court undervalued the sentencing objective of §3553(a)(2)(A) in that it "did not deem the offense to be serious." (Appellee Br. at 66.) The Government supports its argument by citing the court's statement, which is quoted above, that the offense was both serious and not so serious and by positing that the court "based its sentencing determination on the 'not so serious' side of the scale . . . viewing the [defendants'] conduct as no crime at all . . . and engag[ing] in judicial nullification." (Id.)

The Government's argument does not persuade us that the district court abused its discretion in this case. First, the court's decision to place the defendants on probation is supported by findings of fact that are not clearly erroneous. Second, the court followed the Supreme Court's instructions on the law, as spelled out in Gall. Among those was the instruction that the district court give appropriate consideration to the § 3553(a) sentencing factors. The court did so and, moreover, gave a full explanation for its deviation from the Guidelines

sentence range.  In concluding that the deviation was permissible, we have followed Gall's teaching, "taking into account the totality of the circumstances, including the extent of [the] variance from the Guidelines range [and] giv[ing] due deference to the district court's decision that the § 3553(a) factors justif[ied] the variance."  552 U.S. at __, 128 S. Ct. at 597.

## IV.

The judgment of the district court is, in all respects,

AFFIRMED.