[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12089

_____

D.C. Docket No. 1:17-cr-20216-JAL-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BRIGITH DAYANA GOMEZ,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 14, 2020)

Before JORDAN and JILL PRYOR, Circuit Judges, and COOGLER,* District
Judge.

COOGLER, District Judge:

---

* Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama,
sitting by designation.

Brigith Dayana Gomez appeals her convictions, following a jury trial, for one count of conspiracy to transmit an interstate extortionate communication, in violation of 18 U.S.C. §§ 371 and 875(d); three counts of transmission of extortionate communications, in violation of 18 U.S.C. §§ 875(d) and 2; and one count of traveling in interstate or foreign commerce with intent to promote the unlawful activity of extortion, in violation of Fla. Stat. § 836.05, and thereafter performing acts to promote that unlawful activity, in violation of 18 U.S.C. §§ 1952(a)(3) and 2.

The evidence at trial showed that from approximately February 18, 2017, through March 7, 2017, Gomez and her co-defendant, Carolina Del Carmen Roldan, threatened to release to the media personally damaging photos and videos of Ivan Gabriel Aguilera, the son of the famous, now-deceased Mexican singer Juan Gabriel, unless Aguilera paid them $50,000. Gomez and Roldan coordinated their extortionate plan as documented in text messages and then sent the threat via text to Aguilera. Aguilera showed the threat to his lawyer, who engaged in a series of recorded communications and negotiations with Roldan and Gomez. Ultimately, Aguilera and his lawyer alerted the FBI; the FBI recorded additional communications; Gomez flew from Los Angeles to Miami to collect the $50,000; and Gomez was arrested. Gomez consented to a search of her cell phone, which revealed substantial communications confirming the conspiracy.

2

On appeal, Gomez challenges the sufficiency of the evidence to support her convictions and the failure of the district court to give a jury instruction she requested regarding the 18 U.S.C. §§ 1952(a)(3) and 2 charge. After careful review and having had the benefit of oral argument, we conclude that the jury had sufficient evidence to convict Gomez on all five counts and that the district court's ruling on the jury instruction was correct. We thus affirm.

## I.

## A.

In its case-in-chief at trial, the government undertook to establish the following. Beginning in approximately 2014, Aguilera partied with a group of women, including Roldan and Gomez, while he accompanied his father on his concert tours. Although he was married, Aguilera had affairs and exchanged sexually explicit photos with various women.

When Gabriel died unexpectedly in August 2016, Aguilera began receiving intense media coverage, as he was reported to be the sole heir of his father's fortune. Shortly thereafter, Gomez, Roldan, and other women in their social group began to discuss via text messages selling images and videos of Aguilera to the media. The women exchanged pictures and videos of Aguilera naked and kissing women. Gomez specifically wrote that they should describe to the media that

Aguilera was exploiting his deceased father to maintain his lifestyle of "sex, extravagance [and] women."

Ultimately, Gomez and Roldan decided to attempt an extortionate plan without the other women. Hoping to capitalize on Aguilera's increased visibility, they timed their threatening communication with Aguilera to coincide with a large tribute concert that was to be held on February 18, 2017, to honor Gabriel's legacy. On the morning of the concert, Gomez instructed Roldan to send Aguilera a text message threatening to reveal photos and videos to the media unless they were paid. Gomez further directed Roldan to attach videos "so that he sees that we are not playing games."

Just before the concert was to begin on February 18, Aguilera received a text message on his cell phone that read:

> Hello Ivan, how are you? You know, we have some information on you which would be very interesting for the media, for social media, as well as for your wife and your wife's brother. We are close to negotiating this information with Telemundo, but we decided to contact you first. There's no point in reminding you not to try to do anything against the person receiving the exchange because someone else has everything and will disclose it to the public, meaning this is between you and me. The issue is that we have some very compromising videos and photos of you and your brother-in-law in Las Vegas; it would be a shame to reveal how you enjoy your father's inheritance. May he rest in peace. I will send you a portion of what I have, only a portion because I have a lot more photos and videos. Do we negotiate with you or do you prefer that I go to the media?

4

Attached to the text message were four videos showing Aguilera partying with a group of women, including Gomez and Roldan.

Aguilera viewed the message as a threat to his reputation, his marriage, and his family's business. He told his wife about the threat, and she echoed his fear that their family's business would suffer. Aguilera showed the message to his lawyer, Guillermo Pous, and they decided that Pous would try to resolve the situation by responding that he was interested in negotiating. Meanwhile, Roldan told Gomez that she had sent the text as directed, and they both agreed not to "back down."

On February 20, 2017, Pous and Roldan spoke on the phone three times, ultimately reaching a deal whereby Aguilera would pay $50,000 in exchange for Roldan and Gomez not releasing the photos and videos to the media. Roldan suggested to Pous that she was working for an unidentified "man" and refused to give him her full name, going by Carmen alone.

Over the next two weeks, Roldan spoke on the phone with Pous nearly twenty times, with Gomez often directing Roldan's strategy. As Pous attempted to buy time so that he could inform law enforcement authorities, Roldan and Gomez became increasingly aggressive in tone. For example, on February 28, Roldan told Pous that the "man" would release the materials to the media the next day.

During this time Gomez was also communicating with her sister via text messages and phone calls, seeking advice on how to go about obtaining the money.

5

In those communications, Gomez described what she and Roldan were doing as "blackmailing" Aguilera and referred to herself and Roldan as "swindlers." Gomez's sister warned Gomez not to reveal her identity or to collect the money in person because that could mean going to "jail" for "extortion." Gomez's sister also recommended that Gomez and Roldan request wire transfers to two accounts so as not to raise red flags with any banks. However, Gomez told her sister that she wanted to fly to Miami herself to pick up the cash because getting another person involved to handle those aspects of the plan would mean they would have to split the profits further.

On March 1, 2017, Gomez and Roldan traveled from Los Angeles to the Telemundo television network in Miami to try to sell the photos and videos. Telemundo offered only $5,000, so Gomez decided she would give Pous a few more days to come up with the $50,000.

Pous ultimately reported Gomez and Roldan's threats to FBI agents, who met with Aguilera and his wife and facilitated additional recorded phone calls. On March 6, 2017, Pous and Roldan spoke on the phone twice. Roldan revealed her full name and told him that she was working for Gomez. Roldan also gave Pous Gomez's phone number so Pous could call Gomez directly to coordinate Gomez's travel to Miami to collect the money. When Pous called Gomez later that day, Gomez said that she had flown to Miami on her own expense the week before with

6

the intent of getting paid, and therefore that she would return to Miami a second time only if Pous paid for her flight and guaranteed payment. Pous agreed, purchasing a plane ticket in Gomez's name from Los Angeles to Miami for the next day and sent her an email confirming the details. Gomez then took the flight as planned and was arrested by the FBI about twenty minutes after she arrived at the Miami airport.

Following her arrest, Gomez consented to a search of her cell phone. The FBI found extensive written and audio communications with Roldan establishing the conspiracy dating back to September 2016.

**B.**

On March 23, 2017, a Southern District of Florida grand jury returned an indictment charging Gomez and Roldan, in Count 1, with conspiracy to transmit an interstate extortionate communication, in violation of 18 U.S.C. §§ 371 and 875(d); in Counts 2-4, with transmission of extortionate communications, in violation of 18 U.S.C. §§ 875(d) and 2; and in Count 5, with traveling in interstate or foreign commerce with intent to promote the unlawful activity of extortion, in violation of Fla. Stat. § 836.05, and thereafter performing acts to promote that unlawful activity, in violation of 18 U.S.C. §§ 1952(a)(3) and 2.

Roldan pled guilty to Count 1 in exchange for the dismissal of the other counts against her. Gomez's trial began on January 24, 2018. The government

7

called Aguilera, his wife, Pous, and four FBI special agents involved in the

investigation. Numerous audio and text messages and emails were admitted. The

defense called two witnesses: Ricdamis Garcia, the producer for Telemundo who

met with Gomez and Roldan during the conspiracy, and Ivonne Solorzano, one of

the women with whom Aguilera had an affair. Gomez attempted to establish

through their testimony and through cross-examination of government witnesses

that she was not guilty of extortion because Aguilera's reputation was already

tarnished and that she played a minimal role in the offense.

Gomez was found guilty as charged of each count of the indictment. Post-

verdict, Gomez, reiterating the arguments she asserted after the close of the

government's case-in-chief, moved unsuccessfully for a judgment of acquittal.

On May 9, 2018, the district court sentenced Gomez to 20 months' and

fifteen days' imprisonment as to Counts 1-5, all to run concurrently, followed by

two years' supervised release. Judgment was entered the following day. This

appeal followed.

## II.

### A.

Gomez challenges the sufficiency of the evidence on all counts of

conviction. This Court reviews *de novo* the sufficiency of evidence, accepting all

reasonable inferences in favor of the jury's verdict. *United States v. Diaz-Boyzo*,

432 F.3d 1264, 1269 (11th Cir. 2005) (per curiam). "The evidence is sufficient so long as a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt." *Id.* (quoting *United States v. Pineiro*, 389 F.3d 1359, 1367 (11th Cir. 2004)). We conclude that the evidence presented at trial was sufficient to convict Gomez on all five counts of the indictment.

Count 1 charged Gomez with knowingly and willfully conspiring to extort money from Aguilera by use of interstate communications, in violation of 18 U.S.C. §§ 371 and 875(d). The indictment specified the overt acts as including the transmission of the first threat via text message to Aguilera on February 18, Gomez's call on March 6 to Pous to arrange her travel to Miami, and Gomez's flight from Los Angeles to Miami on March 6 to collect the cash. To prove the § 371 conspiracy, the government was required to establish "(1) the existence of an agreement to achieve an unlawful objective; (2) the defendants' knowing and voluntary participation in the agreement; and (3) the commission of an act in furtherance of the agreement." *United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998) (emphasis removed).

The government presented overwhelming evidence of Gomez's guilt at trial, much of it in the form of Gomez's own words in written text messages and recorded calls establishing the extortionate plot and her willing participation in it.

9

Gomez disclaims any criminal intent and attempts to minimize her role in the scheme, but the evidence showed that Gomez directed and assisted Roldan throughout the conspiracy. Gomez instructed Roldan on what to say in the first text message Roldan sent to Aguilera on February 18, after which the two agreed they were not "back[ing] down," and over the next two weeks, Gomez stayed in close contact with both Roldan and her sister via text, discussing how to accelerate the timeline for payment. On March 6, Gomez spoke directly with Pous to finalize the deal and then traveled to Miami to collect the extortionate demand. Additionally, Aguilera, his wife, and Pous testified at length that they considered the text messages and other communications true threats to the reputation and livelihood of Aguilera and his family. The evidence clearly supports the guilty verdict on Count 1.

The record also supports the jury's verdicts of guilt on Counts 2, 3, and 4, each of which charged Gomez with transmitting an extortionate threat in interstate or foreign commerce, in violation of 18 U.S.C. §§ 875(d) and 2. Section 875(d) provides:

> Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 875(d). To prevail under a theory of aiding and abetting pursuant to § 2, the government was required to prove that "(1) the substantive offense was committed by someone; (2) the defendant committed an act which contributed to and furthered the offense; and (3) the defendant intended to aid in its commission." *United States v. Seabrooks*, 839 F.3d 1326, 1333 (11th Cir. 2016) (quoting *United States v. Camacho*, 233 F.3d 1308, 1317 (11th Cir. 2000)).

Count 2 is based upon the first text message that Roldan sent to Aguilera on February 18 threatening to release images and videos if Aguilera did not pay. Although Roldan sent the message, the evidence of Gomez's actions is sufficient to sustain Gomez's conviction on this count under the aiding and abetting theory. Before Roldan sent the message, she and Gomez discussed their strategy and the substance of the message in detail and confirmed to each other after Roldan sent the message that they were not "back[ing] down."

Count 3 is based on three recorded calls on February 20 between Roldan and Pous, in which Roldan pretended to be working for an unidentified "man"—whom she later revealed was in fact Gomez—and specified that "he" wanted $50,000 in exchange for not turning over photos and videos of a compromising nature to the media. The evidence showed that Roldan and Gomez remained in close contact via text while these calls were happening. Also during this period, Gomez specifically

11

discussed with her sister the mechanics of the plan. The record thus contains ample evidence of Gomez's knowing facilitation of the February 20 threats.

Count 4 is based on three calls on March 6—the first two between Pous and Roldan and the third between Pous and Gomez. In those final calls, Roldan revealed to Pous her own and Gomez's identities. Then, Gomez told Pous that she would return to Miami a second time only if Pous paid for her flight and guaranteed payment. Gomez asserts that she was merely making travel arrangements and nothing she said could be interpreted as a threat, but reasonable jurors could disagree and instead find that the purpose of these calls was to finalize the extortionate agreement.

Count 5 charged Gomez with violating the Travel Act, which, among other things, makes it a crime to "travel[] in interstate or foreign commerce . . . with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter [to] perform[] or attempt[] to perform [an act of unlawful activity]." 18 U.S.C. § 1952(a)(3). The statute lists a number of predicate crimes that qualify as unlawful activities, including "extortion, bribery, or arson" in violation of state or Federal law. *Id*. § 1952(b)(2). The district court instructed the jury according to this Court's pattern offense instruction, which listed the elements of 18 U.S.C. §1952(a)(3) as follows: (1) Gomez traveled in interstate or foreign commerce on or

about the dates and between the places described in the indictment; (2) Gomez traveled with the specific intent to promote, manage, establish or carry on an unlawful activity; and (3) while traveling, Gomez knowingly committed an act to promote, manage, establish, or carry on an unlawful activity. *See Eleventh Circuit Pattern Jury Instructions (Criminal Cases)*, 71 (2013). The jury was further instructed that "unlawful activity" includes "any business enterprise involving extortion," and that "[u]nder [Florida] law [making an extortionate threat to a person's reputation] is unlawful." *See id.*

Although Gomez characterizes her flight to Miami to collect the $50,000 as isolated and innocuous, reasonable jurors could instead infer from the evidence that over the course of several weeks, Gomez and Roldan threatened Aguilera with the release of compromising images if he did not pay, and that Gomez flew across the country at Pous's expense with the specific criminal intent to collect the demand in person. We are satisfied that the jury's verdict as to Count 5 is well supported by the evidence.

## B.

Gomez next contends that the district court erred in refusing to instruct the jury in accordance with instructions she requested. This Court reviews the district court's refusal to give a requested jury instruction for abuse of discretion. *United States v. Jordan*, 582 F.3d 1239, 1247 (11th Cir. 2009). "Such refusal constitutes

13

reversible error if: '(1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend [herself].'" *Id.* at 1247–48 (quoting *United States v. Martinelli*, 454 F.3d 1300, 1309 (11th Cir. 2006)). We find no abuse of discretion here.

Gomez's requested instruction related to the applicable *mens rea* under 18 U.S.C. § 1952(a)(3), the Travel Act violation charged in Count 5. Gomez's argument at the charge conference was that by referencing Florida's extortion statute, Fla. Stat. § 836.05 (2014), in the indictment, the government imposed on itself the burden of proving not only the *mens rea* required under § 1952(a)(3)— knowingly traveling with the specific intent to promote the unlawful activity of extortion—but also that she acted with the state-specific *mens rea* of "actual malice," which one Florida court had found necessary under Fla. Stat. § 836.05.[1] The language Gomez proposed adding to the instruction was as follows:

> [U]nder Florida law, making an extortionate threat to reputation is unlawful. However, Florida law requires that the government prove

---

[1]    Fla. Stat. § 836.05 provides, in part: "Whoever, either verbally or by a written or printed communication, . . . maliciously threatens an injury to the . . . reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another . . . with intent thereby to extort money or any pecuniary advantage whatsoever . . . shall be guilty of a felony . . . ." Florida's Fifth District Court of Appeal has defined the term "maliciously" under that statute as acting with "ill will, hatred, spite, or evil intent." *Calamia v. State*, 125 So. 3d 1007, 1010 (Fla. Dist. Ct. App. 2013).

beyond a reasonable doubt that the defendant made the extortionate threat with actual malice. That means the government must prove the defendant made the threat with ill will, hatred, spite, or an evil intent.

The district court denied Gomez's request, instead instructing the jury using this Court's pattern offense instruction, which specified that "unlawful activity" includes "extortion" and "[u]nder Florida law, making an extortionate threat to a person's reputation is unlawful."

The district court did not abuse its discretion in declining to give Gomez's requested instruction because it was not a correct statement of the law. *Jordan*, 582 F.3d at 1247. In a case where the relevant unlawful activity underlying the Travel Act violation was arson, the former Fifth Circuit rejected a defendant's argument that the district court erred by not providing the jury with the state law definition of the offense. *United States v. Conway*, 507 F.2d 1047, 1051–52 (5th Cir. 1975) ("There was sufficient evidence upon which the jury could find that the appellant traveled in interstate commerce with intent to bomb and/or burn a Maryland building. There is no requirement that the jury be instructed on the Maryland definition of arson and there is no reversible error here.").[2] In so holding, the court relied upon the United States Supreme Court's decision in *United States v. Nardello*, 393 U.S. 286 (1969), which addressed the Travel Act's prohibition

---

[2]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

against extortion. *Conway*, 507 F.2d at 1051–52. The defendants in *Nardello* were indicted for their participation in a scheme to obtain money from victims by threats to expose alleged homosexual conduct. 393 U.S. at 287. The indictments charged that the defendants traveled in interstate commerce to promote their activities, which the indictments referred to as "the unlawful activity of blackmail, in violation of the laws of the Common-wealth of Pennsylvania." *Id.* at 287–88. The Pennsylvania statutes distinguished between "extortion" and "blackmail," with "extortion" applicable only to the conduct of public officials. *Id.* at 288. The defendants argued that the indictments were defective because they were not public officials. *Id*. The federal district court agreed and dismissed the indictments. *Id.* On direct appeal to the Supreme Court by the United States pursuant to 18 U.S.C. § 3731, *id.* at 288–89, the Court "decline[d] to give the term 'extortion' [in § 1952(b) such] an unnaturally narrow reading," *id*. at 296. As the Court explained, so long as the acts for which a defendant has been indicted fall within the generic term of extortion as used in the Travel Act—which the Court defined as "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats," *id.* at 290—then such acts constitute a violation of the Travel Act's prohibition, regardless of the specific state label given to that unlawful act. *Id*. at 296.

16

We are bound by the holdings of *Nardello* and *Conway*. Accordingly, there is no requirement that the jury be instructed on the state-specific definition of the predicate crime. *Conway*, 507 F.2d at 1051–52; *see also Martinelli*, 454 F.3d at 1313–14 (drawing from *Conway* in rejecting similar claim in money laundering context). "[T]he inquiry is not the manner in which States classify their criminal prohibitions but whether the particular State involved prohibits the extortionate activity charged." *Nardello*, 393 U.S. at 295. Here, the district court properly instructed the jury that Florida law prohibits making extortionate threats to one's reputation. No more was required of the district court.

## III.

Accordingly, the judgment of the district court is

**AFFIRMED.**