[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12044

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

THOMAS UKOSHOVBERA A. GBENEDIO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cr-00430-TWT-JSA-1

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and ABUDU, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether the district court abused its discretion by denying a motion to dismiss an indictment and making certain evidentiary rulings, and whether it clearly erred by imposing a $200,000 fine. A grand jury charged Thomas Ukoshovbera A. Gbenedio, formerly a licensed pharmacist, with 72 counts of unlawful drug dispensing and one count of refusing an inspection of his pharmacy. The indictment charged that he filled prescriptions "outside the course of professional practice and for other than a legitimate medical purpose." In other words, Gbenedio allegedly operated a "pill mill." A jury convicted Gbenedio on all but two counts of unlawful drug dispensing. The district court sentenced him to 188 months of imprisonment and ordered him to pay a fine. Because the indictment alleged enough facts to give Gbenedio notice of the charges against him, the district court did not abuse its discretion in its evidentiary rulings, and Gbenedio admitted that he could pay a fine within the guideline range, we affirm.

## I. BACKGROUND

Gbenedio was a licensed pharmacist and the sole proprietor of Better Way Pharmacy, an independent pharmacy in Mableton, Georgia. He managed the day-to-day operations at Better Way, which included dispensing controlled substances and interacting with customers. Federal investigators learned about Better Way

while investigating other entities, including Express Health, a nearby pain clinic. Investigators determined that from 2013 to 2015, Gbenedio filled nearly 500 fraudulent prescriptions for highly addictive controlled substances such as oxycodone, hydromorphone, and hydrocodone. As a licensed pharmacy, Better Way was subject to inspections by the federal Drug Enforcement Administration. In 2017, agents arrived for an inspection of Better Way, but Gbenedio stood in the way and refused to allow the agents to conduct their inspection. An agent arrested him for obstruction.

A grand jury returned a 71-count indictment against Gbenedio. The indictment charged 70 counts of unlawful drug dispensing, *see* 21 U.S.C. § 841(a)(1), and one count of refusing an inspection, *see id.* § 842(a)(6). The indictment charged that Gbenedio filled the prescriptions "outside the course of professional practice and for other than a legitimate medical purpose." Then, in table format, the indictment listed the specific prescriptions and, for each count, specified the date Gbenedio distributed the controlled substance, the prescription number, the kind and amount of the controlled substance, and the initials of the customer who received it.

In 2018, Gbenedio moved for a bill of particulars. He asked the prosecutors to specify how he acted "outside the course of professional practice and for other than legitimate medical purposes." The prosecution opposed the motion but informed Gbenedio that "the primary manner" in which it alleged that Gbenedio "illegally dispensed controlled substances involved dispensing pursuant to prescriptions [Gbenedio] knew or should have known were forged

and/or fraudulent." Gbenedio then moved to dismiss the unlawful dispensing counts. Although he conceded that his motion was untimely, Gbenedio argued that the indictment was legally insufficient because it failed to provide notice of the "basis for the prosecution" and "the prosecution's theory of the case."

A magistrate judge denied the motion for a bill of particulars. And it recommended that the district court deny the motion to dismiss the indictment because the motion was untimely and the indictment was legally sufficient. The district court adopted the magistrate judge's recommendation.

One week before trial was scheduled to begin, Gbenedio moved to continue trial. The district court granted the motion and ordered the government to supplement its response to Gbenedio's motion for a bill of particulars. In its amended response, the government explained that to prove that Gbenedio acted "outside the scope of professional practice" and "without a legitimate medical purpose," it intended to introduce testimony about a pharmacist's responsibilities when handling controlled substances and various "red flags" present on the face of the prescriptions that Gbenedio filled.

Gbenedio filed a renewed motion to dismiss the unlawful dispensing counts. The magistrate judge again recommended that the district court deny the motion to dismiss, and the district court adopted that recommendation. Nevertheless, the magistrate judge granted Gbenedio's motion for a bill of particulars. So the prosecution complied and offered its theory of the case. Consistent with

its earlier filings, the prosecution explained that it planned to introduce testimony about a pharmacist's responsibilities when handling controlled substances and various "red flags" on the face of the prescriptions that Gbenedio filled.

A grand jury later charged Gbenedio in a superseding indictment that added two counts of unlawful drug dispensing. The operative indictment charged 72 counts of unlawful drug dispensing (counts 1–72), *see id.* § 841(a)(1), and one count of refusing an inspection (count 73), *see id.* § 842(a)(6). Like the earlier indictment, this one charged that the prescriptions were filled "outside the course of professional practice and for other than a legitimate medical purpose." And for each of the first 72 counts, the indictment specified the date of distribution, the prescription number, the kind and amount of the controlled substance, and the initials of the customer who received it. Gbenedio moved to dismiss the unlawful dispensing counts. The district court adopted the magistrate judge's recommendation to deny the motion.

In October 2021, Gbenedio proceeded to trial on all counts. During opening statements, the prosecutor outlined the charges against Gbenedio and previewed the evidence it would present. As expected, the prosecutor asserted that Gbenedio filled "fake and fraudulent" prescriptions. Gbenedio's counsel previewed the defense and explained that while operating his business, Gbenedio "ran into people who were running their own scheme." In other words, although Gbenedio filled fake prescriptions, he did so

because he was misled by bad actors. Gbenedio's counsel also told the jury that the prosecution would rely on testimony from felons.

During the prosecution's case-in-chief, witnesses explained the legal obligations of pharmacists. A witness explained that under the Controlled Substances Act, a pharmacist must verify that a prescription was ordered by a doctor acting in the usual course of his practice and for a legitimate medical need. If there is any indication that the prescription might be illegitimate, the pharmacist must inquire further or refuse to fill the prescription. And if the pharmacist dispenses that prescription in the face of unresolved issues, he is as liable as the physician who issued it.

Charlyn Carter, a former medical assistant and office manager at Express Health, testified that while working at Express Health, she sold and verified fake prescriptions. She also testified that she personally brought fake prescriptions to Better Way and that Gbenedio filled them. On cross-examination, defense counsel asked about Carter's criminal history. Counsel asked if Express Health was a "pill mill" and if Carter went to prison because she participated in a "pill mill." Carter responded "yes" to both questions. Counsel also questioned Carter about her testimony in the trial of an Express Health doctor, Dr. Romie Roland, and about the criminal conduct of others at Express Health.

Dianne Fikes, a former Better Way customer, testified that she purchased fake prescriptions from employees of Express Health and had them filled at Better Way. She explained that at some point, Gbenedio told her that he could no longer fill

prescriptions from a certain doctor at Express Health and that she should find another doctor. During that conversation, Fikes said that Gbenedio handed her a prescription and told her, "[T]his is what it should look like." Fikes said that she created fake prescriptions on her laptop based on Gbenedio's example and printed them on Gbenedio's printer. According to Fikes, Gbenedio filled the fake prescriptions that day. On cross-examination, defense counsel focused on Fikes's criminal history. Counsel asked Fikes about being "arrested and charged with producing false and fraudulent prescriptions in Alabama." She initially denied the arrest. But after a few follow-up questions, she confirmed that she was in fact arrested.

Two doctors, Dr. James Murtaugh and Dr. Benjamin Auerbach, also testified for the prosecution. Their names often appeared on the fake prescriptions filled by Gbenedio. When showed the specific prescriptions attributed to them, both doctors denied writing them based on the handwriting, the amounts prescribed, and other errors.

Agent Jason Allen, the lead investigator, testified that he learned about Better Way while investigating Express Health. When asked what happened to Express Health, Allen explained that "we shut them down," and several people were "convicted." He also testified that the administrative inspection of Better Way turned into a criminal investigation when he came to believe that Gbenedio dispensed "controlled substances without a legitimate medical purpose, outside the normal course of practice." Over

Gbenedio's Rule 704(b) objection, Allen explained how pill mills operated. He explained that the Better Way "store front was an air of legitimacy," meant to "give off the appearance of being legitimate when [it was] really just selling . . . prescriptions." Another agent offered similar testimony that Better Way was "just a front."

Gbenedio offered several witnesses and testified in his own defense. He attempted to call Officer Tyler Benson to impeach the testimony of Dianne Fikes. Defense counsel explained that Fikes had denied her Alabama arrest and that the purpose of Benson's testimony was to impeach that denial. The prosecutor objected that because Fikes admitted to the arrest, there was no testimony to impeach. Without reviewing the trial transcript, the district court ruled, "[M]y recollection is that she admitted she was arrested. So [Benson's] testimony that she was arrested is merely cumulative, and so I sustain the objection." Still, it allowed Gbenedio to make a proffer outside the presence of the jury. During the proffer, Benson testified that Fikes had forged 30 prescriptions for controlled substances in Alabama and described the steps he took after learning that Fikes had forged prescriptions. After the proffer, the district court said, "I'll adhere to my ruling. This is all way beyond impeachment."

The jury found Gbenedio guilty on counts 1 through 70 and count 73 and not guilty on counts 71 and 72. The district court ordered Gbenedio to report to probation on the following Monday to be placed on electronic monitoring. But Gbenedio fled the

jurisdiction. He was arrested in Texas while seeking to board a flight to Istanbul.

A probation officer prepared a presentence investigation report. To assist with the report, the office sought financial information from Gbenedio. During an interview with a probation officer, defense counsel and Gbenedio suggested that Gbenedio's wife should prepare a financial statement. But neither Gbenedio nor his wife provided the statement, despite several requests from the probation office.

The presentence report calculated Gbenedio's custody guideline range at 188 to 235 months and his fine guideline range at $40,000 to $400,000. It stated that Gbenedio has been unemployed since 2017 and that he relied on "pension funds, Social Security benefits, and his wife's earnings." It also stated that he has been incarcerated since November 2021 and has had no income while in prison. In the same section, the report also recommended a fine within the guideline range: "Since [Gbenedio] failed to establish he is unable to pay a fine or is not likely to become able to pay a fine, it is this officer's position he has the ability to pay a fine within the fine guideline range."

Gbenedio objected to several items in the report. But he did not object to the probation officer's finding that he could "pay a fine within the fine guideline range." Gbenedio filed a sentencing memorandum that focused on his health conditions and age. The memorandum did not address his financial condition or ability to pay a fine.

At sentencing, the district court stated that it would "adopt the facts in the [p]resentence [r]eport." It explained, "As set forth in [the presentence report], [Gbenedio] has failed to establish that he's unable to pay a fine. Therefore, the Court can impose a fine within the guideline range." It then described its "sentencing options" and explained that "[t]he fine guideline range is $40,000 to $400,000." The district court asked defense counsel if there were any objections to the guideline calculations, and counsel replied "[n]o."

The district court sentenced Gbenedio to 188 months of imprisonment and imposed a $200,000 fine. It stated, "Mr. Gbenedio and his family just refuse to cooperate in any investigation by the probation officer into what his financial circumstances were, again, a demonstration of just total lack of remorse, total lack of respect for the law." Gbenedio's counsel objected to the sentence and the fine. Counsel asserted that Gbenedio was unable to pay a fine, and she took personal responsibility for failing to provide Gbenedio's financial information to the probation officer.

## II. STANDARDS OF REVIEW

Three standards govern our review. We review *de novo* whether an indictment sufficiently alleges an offense, and we review for abuse of discretion a denial of a motion to dismiss an indictment. *United States v. Pendergraft*, 297 F.3d 1198, 1204 (11th Cir. 2002). We review evidentiary rulings also for abuse of discretion. *United States v. Carthen*, 906 F.3d 1315, 1320 (11th Cir. 2018). A district court abuses its discretion if it "applies an incorrect legal standard, follows improper procedures in making the determination, or

makes findings of fact that are clearly erroneous." *United States v. Jordan*, 582 F.3d 1239, 1249 (11th Cir. 2009) (citation and internal quotation marks omitted). And we review for clear error a finding that a defendant can pay a fine. *United States v. McNair*, 605 F.3d 1152, 1232 n.132 (11th Cir. 2010). Clear error arises when "our review of the record leaves us with the definite and firm conviction that a mistake has been committed." *United States v. White*, 335 F.3d 1314, 1319 (11th Cir. 2003) (citation and internal quotation marks omitted).

## III. DISCUSSION

We divide our discussion into six parts. First, we explain why the district court did not abuse its discretion by denying Gbenedio's motion to dismiss the superseding indictment. Second, we explain why the district court did not abuse its discretion by allowing testimony about other convictions. Third, we explain why the district court did not abuse its discretion by allowing opinion testimony from federal agents. Fourth, we explain that the district court did not abuse its discretion by excluding Officer Benson's impeachment testimony. Fifth, we explain that no cumulative error requires reversal. Last, we explain that the district court did not clearly err by imposing a $200,000 fine.

### A. *The District Court Did Not Abuse its Discretion by Denying Gbenedio's Motion to Dismiss the Superseding Indictment.*

Gbenedio argues that the district court abused its discretion by denying his motion to dismiss the unlawful dispensing counts (counts 1–72) in the indictment. The parties agree that the

indictment contained facts about Gbenedio and his pharmacy, the Controlled Substances Act, and the prescriptions. But in Gbenedio's view, the indictment offered "no way of knowing what theory the government was proceeding under" and whether it believed that the prescriptions were "falsified" or whether they were "actually written by prescribers" when they should not have been.

An indictment "presents the essential elements of the charged offense," "notifies the accused of the charges to be defended against," and "enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *Jordan*, 582 F.3d at 1245 (citation and internal quotation marks omitted). When an indictment describes the offense using statutory language, it must also include enough "'facts and circumstances'" to "'inform the accused of the specific offense . . . with which he is charged.'" *United States v. Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003) (quoting *Russell v. United States*, 369 U.S. 749, 765 (1962)). But an indictment need not "allege in detail the factual proof that will be relied upon to support the charges." *United States v. Sharpe*, 438 F.3d 1257, 1264 n.3 (11th Cir. 2006) (citation and internal quotation marks omitted). And the prosecution need not describe "all overt acts that might be proven at trial." *See United States v. Martell*, 906 F.2d 555, 558 (11th Cir. 1990).

Gbenedio's indictment was legally sufficient. As he concedes, the indictment alleged facts about him and his pharmacy, the Controlled Substances Act, and the 72 prescriptions. It described

the legal requirements governing the dispensation of controlled substances. It explained that, with limited exceptions for medical professionals, the Controlled Substances Act makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance." *See* 21 U.S.C. § 841(a)(1). And it explained that registered pharmacists may dispense controlled substances for a valid prescription, but prescriptions are valid only if "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *See* 21 C.F.R. § 1306.04(a). The indictment charged Gbenedio with 72 counts of unlawful drug dispensing. *See* 21 U.S.C. § 841(a)(1). Each count used statutory language and listed the essential elements of the offense. *See Jordan*, 582 F.3d at 1245. Each count specified the date on which Gbenedio unlawfully distributed a controlled substance, the prescription number, the kind and amount of the controlled substance, and the initials of the customer who received the controlled substance. These facts gave Gbenedio notice of the charges against him. *See id.* And because the indictment described the prescriptions with specificity, Gbenedio may rely on a judgment as a bar against future prosecutions for the same distributions. *See id.*

Gbenedio argues that he was entitled to more information. He says that he needed to know what made the prescriptions invalid, and whether the prosecution believed that they were "falsified" or "actually written by prescribers." Gbenedio maintains that he needed to know "what theory the government was proceeding under" and "what evidence would be presented at trial."

We disagree. *Why* a prescription is invalid relates to the prosecution's theory of the case—not the elements of the offense. As we explained above, the indictment need not detail "the factual proof that will be relied upon to support the charges." *Sharpe*, 438 F.3d at 1264 n.3. Indeed, even when a bill of particulars is required, the prosecution has no obligation to "'explain the legal theories upon which it intends to rely at trial.'" *United States v. Maurya*, 25 F.4th 829, 838 (11th Cir. 2022) (quoting *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980)). And defendants are not entitled to a "detailed disclosure of the government's evidence prior to trial." *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017) (citation and internal quotation marks omitted). Gbenedio does not argue that he lacked notice of the *offenses* with which he was charged. He argues that he was entitled to the government's "theory" and "evidence."

Gbenedio compares his indictment to the deficient charges in *Russell v. United States*, but the comparison is inapt. 369 U.S. 749. The *Russell* indictments charged defendants who were summoned to testify before a congressional committee with refusing to answer questions "'pertinent to the [subject] then under inquiry.'" *Id.* at 752. But the indictments never specified the subject "under inquiry." *Id.* Under federal law, a witness could lawfully refuse to answer questions if the questions did not pertain to the subject under inquiry. *Id.* at 755. So without knowing the subject under inquiry—the "very core of criminality" under the statute—a defendant could not understand the nature of the accusation against him. *Id.* at 764–65.

Unlike the indictments in *Russell*, Gbenedio's indictment alleged enough details to inform Gbenedio of the charges against him. It alleged that Gbenedio "knowingly" distributed controlled substances by "filling prescriptions . . . outside the course of professional practice and for other than a legitimate medical purpose." And it described each prescription in unmistakable detail. Gbenedio's indictment was anything but "cryptic." *See id.* at 766.

What is more, Gbenedio learned the prosecution's theory and evidentiary plan before trial. He insists that he was left "speculating" about what evidence would be presented and how to defend himself. But the pretrial filings and bill of particulars remedied those concerns. *See United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981) ("The purpose of a bill of particulars is to inform the defendant of the charge in sufficient detail to enable adequate defense preparation and to minimize surprise at trial."). Nearly three years before trial, the prosecutors informed Gbenedio in writing that "the primary manner" in which it alleged that he "illegally dispensed controlled substances involved dispensing pursuant to prescriptions [Gbenedio] knew or should have known were forged and/or fraudulent." And over 18 months before trial, the prosecution explained that it intended to introduce testimony about "red flags" present on the face of the prescriptions. The prosecution reiterated these details in a bill of particulars filed over a year before trial.

To be sure, a bill of particulars cannot save an invalid indictment. *Russell*, 369 U.S. at 770. But Gbenedio's indictment was

legally sufficient. And the bill of particulars fulfilled its "purpose" of "enabl[ing] adequate defense preparation" and "minimiz[ing] surprise at trial." *Colson*, 662 F.2d at 1391. Gbenedio was not entitled to more. *See Burgin*, 621 F.2d at 1359 (explaining that a bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial").

### B. The District Court Did Not Abuse its Discretion by Allowing Testimony About Other Individuals' Convictions.

Gbenedio argues that the district court abused its discretion by admitting evidence about the investigation and prosecution of other wrongdoers. He complains that the district court allowed Agent Jason Allen of the Drug Enforcement Administration to testify that Better Way came up in other investigations; employees of Express Health were convicted of similar crimes; Better Way filled invalid prescriptions from Dr. Roland; and Better Way filled prescriptions from doctors who have been investigated or indicted. Gbenedio complains that this evidence was introduced as substantive evidence of his guilt. And even were it not admitted for that purpose, Gbenedio contends that the evidence was unduly prejudicial because "it indicated to the jury that the other people involved in pill mills . . . had already been investigated, tried, and convicted." These arguments fail.

Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." FED. R.

EVID. 401. Relevant evidence is generally admissible. *Id.* R. 402. But relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice. *Id.* R. 403. Even when relevant, evidence of another person's conviction may not be used as substantive evidence of the defendant's guilt. *United States v. DeLoach*, 34 F.3d 1001, 1004 (11th Cir. 1994). "It is a basic tenet of our criminal jurisprudence that guilt or innocence must be determined one defendant at a time without regard to the disposition of charges against others." *United States v. Eason*, 920 F.2d 731, 738 (11th Cir. 1990) (citation and internal quotation marks omitted).

Evidence of another person's guilt may be admissible for other evidentiary purposes. *See United States v. McLain*, 823 F.2d 1457, 1465 (11th Cir. 1987), *abrogation on other grounds recognized by United States v. Watson*, 866 F.2d 381, 385 n.3 (11th Cir. 1989). When the evidence is not offered as substantive evidence of the defendant's guilt, its admissibility is subject to Rule 403. *Id.* And when making a Rule 403 determination, district courts consider several factors, including "'whether there was a proper purpose in introducing the fact of the guilty plea [or conviction]'" and "'whether the introduction of the plea [or conviction] was invited by defense counsel.'" *Id.* (quoting *United States v. King*, 505 F.2d 602, 608 (5th Cir. 1974)). A district court's discretion to exclude evidence as unduly prejudicial is "narrowly circumscribed." *United States v. McGregor*, 960 F.3d 1319, 1324 (11th Cir. 2020) (citation and internal quotation marks omitted); *see also United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) (explaining that "the federal rules favor

admission of evidence over exclusion if the evidence has any probative value").

Allen's testimony was not offered as substantive evidence of Gbenedio's guilt. Instead, it was offered in response to questions about why the government investigated Gbenedio and what the investigation uncovered. For example, when asked when he heard about Better Way, Allen explained that he learned about Better Way while investigating Express Health. And when asked "[w]hat ultimately happened to Express Health," Allen responded, "[W]e shut them down." He then said that "[t]he doctor was convicted," "Charlyn Carter was convicted," and "[t]he clinic owner was convicted." We have distinguished deliberate questioning about convictions from "inadvertence" or from times when a witness volunteers or "'blurt[s] out'" the information in response to a question that was not directly seeking it. *Eason*, 920 F.2d at 734 (reversing because the prosecutor asked leading questions that stated the facts of the coconspirator's exact charge and that he was convicted); *see United States v. Griffin*, 778 F.2d 707, 709–11 (11th Cir. 1985) (reversing because the district court told jurors that a coconspirator was found guilty and read the coconspirator's indictment to the jury). Here, the testimony about other people's convictions was not expressly elicited by the prosecution; it was part of Allen's elaboration about the investigation. Because the testimony was not offered as substantive evidence of Gbenedio's guilt, its admissibility was subject to Rule 403.

The testimony also was not unfairly prejudicial because

Gbenedio's counsel had already presented information about other people's convictions to the jury. During his opening statement, Gbenedio's counsel explained that while operating his business, Gbenedio "ran into people who were running their own scheme. There were people who were stealing prescriptions from doctors' offices, places like Express [Health], people like the Government's witnesses who are running their own scheme." He told the jury that some government witnesses were felons. He said, "[Charlyn Carter]'s a convicted felon" and "[Dianne Fikes]'s a convicted felon." He also asserted that the prosecutors were "depending on the word of these folks who they have already indicted and prosecuted." So before Allen ever took the stand, Gbenedio told the jury about other people's convictions.

Throughout the trial, Gbenedio's counsel reiterated that Express Health was a pill mill and that affiliated individuals had been prosecuted and convicted. On cross-examination of Carter—and before Allen took the stand—counsel inquired about criminal activity at Express Health. Counsel asked Carter, "that's actually why you went to prison; is that right . . . [b]ecause you were helping further participate in the pill mill?" Counsel also questioned Carter about her testimony during Dr. Roland's trial: "[Y]ou came into court and testified against Dr. Roland, right?" And counsel questioned Carter about the criminal conduct of others at Express Health.

When determining admissibility under Rule 403, the district court was entitled to consider "whether the introduction of the

[evidence] was invited by defense counsel." *McLain*, 823 F.2d at 1465 (citation and internal quotation marks omitted). Here, the introduction of evidence about other people's convictions was not only invited by defense counsel; it was *introduced* by him. Gbenedio suffered no prejudice.

### C. The District Court Did Not Abuse its Discretion by Admitting Opinion Testimony from Federal Agents.

Gbenedio argues that the district court erred by allowing federal agents to offer improper opinion testimony. He contends that Allen and other agents who testified as lay witnesses offered expert opinions without being qualified as expert witnesses and that the district court allowed them to testify that Gbenedio had the requisite intent in violation of Federal Rule of Evidence 704(b). *See* FED. R. EVID. 704(b) (prohibiting *expert* witnesses from opining whether the defendant had a mental state or condition that constitutes an element of a crime). But because the agents testified based on professional experience and not based on scientific or technical knowledge, their testimony was lay opinion, and the district court did not abuse its discretion by admitting it.

The Federal Rules of Evidence distinguish between lay and expert opinion testimony. Lay opinion must be "rationally based on the witness's perception;" "helpful to clearly understanding the witness's testimony or to determining a fact in issue;" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id.* R. 701. "Lay opinion testimony cannot provide specialized explanations or interpretations that an

untrained layman could not make if perceiving the same acts or events." *Great Lakes Ins. SE v. Wave Cruiser LLC*, 36 F.4th 1346, 1358 (11th Cir. 2022) (citation and internal quotation marks omitted). Expert opinion, by contrast, is opinion testimony based on "scientific, technical, or other specialized knowledge." FED. R. EVID. 702. Expert witnesses must be properly "qualified," and their opinions are admissible only if certain reliability requirements are met. *See id.* In criminal cases, "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." *Id.* R. 704(b).

We examine the basis of an opinion to determine whether it is lay or expert. *See United States v. Williams*, 865 F.3d 1328, 1341 (11th Cir. 2017); *see also* FED. R. EVID. 701, advisory committee's note to 2000 amendment. Lay opinion is based on a witness's personal "perception[s]" and "experiences." *Williams*, 865 F.3d at 1341 (citation omitted). Expert opinion is based on "scientific, technical, or other specialized knowledge." FED. R. EVID. 702. The distinction sometimes blurs when testimony is based on professional work. But we have held that a witness may offer "lay opinion testimony based on his professional experiences as long as the testimony is rationally based on those experiences, rather than on scientific or technical knowledge." *Williams*, 865 F.3d at 1341 (citation and internal quotation marks omitted); *see also United States v. Novaton*, 271 F.3d 968, 1008–09 (11th Cir. 2001) (holding that opinion testimony about the meaning of code words used by defendants was based on perceptions and experience as police officers and

22                    Opinion of the Court                    22-12044

constituted lay opinion testimony).

Gbenedio challenges the admission of several statements. First, he points to Allen's testimony that Gbenedio "dispens[ed] controlled substances without a legitimate medical purpose, outside the normal course of practice." He also points to Allen's testimony that the Better Way "store front was an air of legitimacy," meant to "give off the appearance of being legitimate when [it was] really just selling . . . prescriptions." He points to Allen's statement that pill mill pharmacies "know they're subject to inspection. They know that the [Drug Enforcement Administration] or the state can come in and look . . . . They want to give off the appearance of being legitimate to basically deceive law enforcement." And Gbenedio challenges the testimony of other witnesses who said that Better Way was "just a front."

The district court did not abuse its discretion by admitting this testimony as lay opinion. *See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1223 (11th Cir. 2003) (affirming admission of lay opinion testimony when witnesses testified not using scientific or technical "knowledge subject to Rule 702" but only "knowledge garnered from years of experience within the field"). None of the testimony was based on "scientific, technical, or other specialized knowledge." *See* FED. R. EVID. 702. And none of it "provide[d] specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *See Great Lakes Ins. SE*, 36 F.4th at 1358 (citation and internal quotation marks omitted). Instead, the testimony

was rationally based on the officers' experiences as investigators. *See Williams*, 865 F.3d at 1341. And it conveyed the officers' opinions based on their personal observations during the investigation.

Gbenedio relies on *United States v. Hawkins* to argue that Allen was an expert, but we disagree with his argument. 934 F.3d 1251 (11th Cir. 2019). In *Hawkins*, the prosecutor repeatedly asked the witness for his "expert opinion" and "the district court told the jury several times that [the witness] was permitted to testify 'based upon his experience and knowledge with respect to technical subject matters.'" *Id.* at 1265. In other words, the witness was "paraded before the jury as an expert." *Id.* Here, unlike in *Hawkins*, the prosecutors did not describe Allen as an expert. The district court told the jury that Allen could testify only "to what his personal observations were as a layperson."

### D. The District Court Did Not Abuse its Discretion by Excluding Officer Tyler Benson's Impeachment Testimony.

Gbenedio argues that the district court abused its discretion by preventing him from using Benson's testimony to impeach Dianne Fikes. Specifically, he contends that "[w]hen Fikes denied [her Alabama arrest] and relevant facts about the incident," it was then appropriate for Gbenedio to impeach her by disproving the testimony she offered. Gbenedio argues that the district court improperly excluded Benson's testimony under Federal Rule of Evidence 608(b).

To be sure, Rule 608(b) does not prohibit impeachment by contradiction. But Benson's testimony would not have

contradicted Fikes's testimony. The admissibility of Benson's testimony was still subject to Rule 403, and the district court did not abuse its discretion by excluding it under *that* Rule.

Under Federal Rule of Evidence 608(b), "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." District courts have broad discretion when determining the admissibility of extrinsic evidence. *See United States v. Calle*, 822 F.2d 1016, 1019–20 (11th Cir. 1987). But there is an "absolute bar" on extrinsic evidence when "the sole purpose for offering the evidence [is] to prove the witness'[s] character for veracity." FED. R. EVID. 608, advisory committee's note to 2003 amendment. In other words, extrinsic evidence may never be admitted to prove that someone tends to lie. *See Carthen*, 906 F.3d at 1321 ("Using past conduct to suggest a witness has a generally dishonest character is precisely what Rule 608(b) does not allow.").

The scope of Rule 608(b) was amended—and narrowed—in 2003. *See id.* at 1323 (W. Pryor, J., concurring). Before the amendment, Rule 608(b) prohibited extrinsic evidence for the purpose of attacking a witness's "'credibility.'" *Id.* But in 2003, the Rule was amended to replace the word "'credibility'" with the phrase "'character for truthfulness.'" *Id.* "The purpose of this amendment was 'to clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness'[s] character for truthfulness.'" *Id.* (quoting FED. R. EVID. 608, advisory committee's note to 2003

amendment). Put differently, the absolute prohibition applies only when extrinsic evidence is offered to prove that a witness is a *liar* in general. But it does not bar extrinsic evidence offered to prove that a witness *lied* on the stand. *See* FED. R. EVID. 608, advisory committee's note to 2003 amendment ("[T]he amendment leaves the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity) to Rules 402 and 403.").

Although extrinsic evidence might be used to prove that a witness lied on the stand, the admissibility of that evidence remains subject to Rule 403. *See id.* Rule 403 permits a district court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Gbenedio tried to call Benson to impeach Fikes, a prosecution witness. Fikes initially denied her arrest for producing false prescriptions, but after a few follow-up questions, she confirmed that she was in fact arrested. Defense counsel explained that "the purpose of [Benson's testimony]" was to impeach Fikes's testimony about the arrest. The prosecutor objected because Fikes admitted to the arrest. After a brief exchange with counsel, the district court ruled, "[M]y recollection is that she admitted she was arrested. So [Benson's] testimony that she was arrested is merely cumulative, and so I sustain the objection."

The district court also allowed defense counsel to make a proffer outside the presence of the jury. During the proffer, counsel asked Benson to describe the steps he took after learning that Fikes had forged prescriptions. Benson explained that he looked at Alabama's prescription drug monitoring database and saw that Fikes forged 30 prescriptions. He also explained that he obtained pharmacy surveillance footage. After the proffer, the district court announced, "I'll adhere to my ruling. This is all way beyond impeachment or [Rule] 608."

The district court did not abuse its discretion by excluding Benson's testimony for two reasons. First, the district court correctly determined that Benson's testimony would not contradict Fikes's testimony. To be sure, Rule 608(b) does not prohibit impeachment by contradiction, and defense counsel described Benson's testimony as being offered for that purpose. But Fikes admitted that she had been arrested. So there was nothing for Benson to contradict as to that fact, and Benson's testimony was excludable. *See BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1476 (11th Cir. 1992) ("When a witness admits making a prior inconsistent statement, extrinsic proof of the statement is excludable."). Second, even if Benson's testimony were admissible under Rule 608(b), it remained subject to Rule 403, and the district court did not abuse its discretion by excluding it under that Rule. Under Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence." Fikes's earlier testimony confirmed that she was arrested. So, as the district court explained, "[Benson's]

testimony that she was arrested is merely cumulative." And though Fikes denied the facts of that arrest, which Gbenedio argues would have shown that she knew how to forge prescriptions even before meeting Gbenedio, there was other evidence in the record that Gbenedio did not teach Fikes for the first time how to forge prescriptions. So again, the testimony was properly excluded as cumulative evidence.

### E. There is No Cumulative Error.

Gbenedio argues that even if the evidentiary rulings described above are nonreversible errors, the combined prejudice they cause requires reversal. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Margarita Garcia*, 906 F.3d 1255, 1280 (11th Cir. 2018) (citation and internal quotation marks omitted). But the district court did not make any erroneous evidentiary rulings. Because Gbenedio has not identified any error, "his argument that all of his claimed errors, when taken together, compel reversal necessarily fails." *United States v. Benjamin*, 958 F.3d 1124, 1137 (11th Cir. 2020).

### F. The District Court Did Not Clearly Err by Imposing a $200,000 Fine.

Last, Gbenedio argues that the district court clearly erred by imposing a $200,000 fine. He contends that the record establishes that he is unable to pay and that his attorney is to blame for failing to provide financial information to the probation office. Because

Gbenedio had the burden of proving his inability to pay and failed to do so, the district court committed no clear error.

The Sentencing Guidelines require district courts to "impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." United States Sentencing Guidelines Manual § 5E1.2(a) (Nov. 2021). If the defendant establishes that he is unable to pay or that a fine would unduly burden his dependents, the district court may impose a lesser fine or waive it. U.S.S.G. § 5E1.2(e). The defendant has the burden of proving inability to pay. *United States v. Gonzales*, 541 F.3d 1250, 1255 (11th Cir. 2008).

Gbenedio argues that certain facts in the presentence report reveal that he is unable to pay. The report states that Gbenedio has been unemployed since 2017, that he relied on "pension funds, Social Security benefits, and his wife's earnings," and that he has been incarcerated since November 2021 and has no income. Gbenedio also explains that two judges declared him indigent and that eligibility for appointed counsel is a "significant indicator[]" of inability to pay. *See* U.S.S.G. § 5E1.2, cmt. n.3.

Gbenedio ignores other parts of the presentence report. In the section that explains that Gbenedio is incarcerated, the report recommends a fine: "Since [Gbenedio] failed to establish he is unable to pay a fine or is not likely to become able to pay a fine, it is this officer's position he has the ability to pay a fine within the fine guideline range." Gbenedio did not address this paragraph in his objections to the report or in his final sentencing memorandum.

And "failure to object to allegations of fact in a [presentence report] admits those facts for sentencing purposes." *United States v. Turner*, 626 F.3d 566, 572 (11th Cir. 2010) (citation and internal quotation marks omitted).

Before sentencing, Gbenedio failed to cooperate with the probation officer's requests for financial information. "[U]nwillingness to answer specific questions" from the probation officer about one's financial status "may permit the inference" that one is "concealing assets." *United States v. Hernandez*, 160 F.3d 661, 666 (11th Cir. 1998). When a defendant is not forthcoming about his financial circumstances, the district court may find that he has not carried his burden of proving inability to pay. Gbenedio argues that the failure to provide financial information was his counsel's mistake. But Gbenedio had the burden of proving his inability to pay. *Gonzales*, 541 F.3d at 1255. And he concedes that "he did not provide the requested financial information" to the probation officer.

Even at sentencing, Gbenedio made no effort to prove his inability to pay. The district court explained that it was adopting the facts in the presentence report "to which no objection has been made." Defense counsel did not object. The district court said, "As set forth in [the presentence report], [Gbenedio] has failed to establish that he's unable to pay a fine. Therefore, the Court can impose a fine within the guideline range." Again, defense counsel did not object. The district court then described its "sentencing options" and explained that "[t]he fine guideline range is $40,000 to $400,000." It asked defense counsel directly if there were any

objections to the guideline calculations, and counsel replied "[n]o." Later, the district court imposed Gbenedio's sentence and $200,000 fine. It explained, "I'm imposing a fine within the guideline range because, again, Mr. Gbenedio and his family just refuse to cooperate in any investigation by the probation officer into what his financial circumstances were, again, a demonstration of just total lack of remorse, total lack of respect for the law." Gbenedio's counsel objected to the fine for the first time *after* it was imposed, but he offered no proof of inability to pay it. The district court did not err.

Gbenedio argues that the failure to provide requested information to the probation officer was his *counsel's mistake*, not his own. That argument might support a claim for ineffective assistance of counsel, but we consider ineffective-assistance-of-counsel claims on direct appeal only "if the record is sufficiently developed." *United States v. Camacho*, 40 F.3d 349, 354 (11th Cir. 1994), *overruled in part on other grounds by United States v. Sanchez*, 269 F.3d 1250 (11th Cir. 2001) (en banc). Gbenedio has not identified any evidence that suggests that his counsel was ineffective. That his counsel accepted responsibility for mistakes is not evidence. *See United States v. Valois*, 915 F.3d 717, 726 (11th Cir. 2019) ("[S]tatements and arguments of counsel are not evidence." (citation and internal quotation marks omitted)). So the record is not sufficiently developed to consider this argument at this stage.

## IV. CONCLUSION

We **AFFIRM** Gbenedio's convictions and sentence.